[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The defendant, Winthrop Baum (Baum), acquired title to the premises known as 500 Papurah Road in Fairfield in 1981. The defendant, Stafford Higgins Industries (Stafford), acquired their interest in the property in October of 1990 by virtue of a Certificate of Foreclosure. That property first came to the attention of the Wetlands Agency of the Conservation Commission of the Town of Fairfield in the fall of 1993 when Mr. Baum brought in a contractor without a permit to do some cleaning and grubbing of a portion of his back yard which was located in a wetland area. Apparently, a piece of construction equipment got stuck in an area of Carlisle muck and another large piece of equipment was required to pull it out. The resultant activity created a small pond that did not previously exist.
As a result of this activity, the plaintiff, acting through its Wetlands Compliance Officer Donald Nolte, sent a letter to Mr. Baum dated September 15, 1993, setting forth the Notice of Violation (plaintiff's exhibit E) of the Town's Inland Wetlands and Watercourses Regulations. Apparently, the parties met on November 11, 1993, and a restoration plan was agreed upon. Despite repeated delays in completing the work, the parties agree that compliance was finally made in 1995. The purpose of this evidence was to demonstrate knowledge on the part of the defendant Baum of the Town's Wetland Regulations and the fact that his property or some of it existed in a wetland.
The area of the 1993 and subsequent claimed violations of the wetland regulations was designated by the initials CE on the wetland maps known as "Carlisle Muck" and is described as wet, shaky and loose soil. The major limitations of this soil for community development are wetness, a high water table, ponding, and the instability of the organic materials.
In September of 1996, Mr. Nolte again reviewed the subject property concerning new problems. On October 3, 1996, the Commission wrote Mr. Baum complaining of the construction by him of a shed and greenhouse on CT Page 12422 or adjacent to the wetland, that the wetland soil had been cleared of natural vegetation in the area of the previous restoration, and new materials such as logs, topsoil, chips, and Belgian blocks had been deposited in the wetland, all without permits. (Plaintiff's exhibit O.) Subsequently, on October 28, 1996 (plaintiff's exhibit P), Mr. Nolte on behalf of the Commission issued to the defendants an Order to Restore Wetlands and an Order to Appear at a Show Cause Hearing. The Commission claimed that there were violations of the restoration plan agreed upon in 1994 as well as construction of a shed and greenhouse without permits and the deposit of large amounts of logs, soil and wood chips to create a pathway through the wetland to other upland property of the defendants.
A hearing was held on said order on November 7, 1996. At said hearing the previous Order to Restore dated October 28, 1996, was tabled for 60 days to allow Mr. Baum to file an Inland Wetlands Permit Application for the shed, dock, greenhouse, path to the uplands and the alleged overfilling. Acting upon that application, on May 15, 1997, the Commission granted Conditional Approval for Permit Application 97-1. (Plaintiff's exhibit V.) In that document, the Commission provided a lengthy history of the wetland area on the Baum property, a description of the character of the regulated area, and the present violations. In his application, Mr. Baum was asking to establish a 10 foot wide nature walk through the Carlisle muck, a distance of approximately 480 feet, to access his property in the rear. Mr. Baum's application proposed the creation of a farm, garden areas to harvest crops, the conduct of a nursery, and otherwise farm his entire property, much of it in the regulated area.
Plaintiff's exhibit V further goes on to describe the anticipated impact of Mr. Baum's proposed activities, all of which the Commission determined to be regulated activities. All of these activities the Commission concluded will have a significant and adverse impact on the wetland. (See pages 6 and 7 of Plaintiff's exhibit V.) The Commission imposed as a condition of approval that the existing path be removed by removing the logs, fill and chips that created it, by replanting those area with native vegetation and the construction of an elevated boardwalk above the wetland. Several other alternatives were discussed. The Commission further ordered the restoration of runnels, as well as relocation of the greenhouse. The dock and shed were allowed to remain as long as the wetland was fully restored. The balance of the exhibit details the Commission's Finding of Facts, its Decision and the Specific Conditions of Approvals, all of which envisioned the filing of a new plan within 30 days. Mr. Baum was required to sign and accept to this proposal within 20 days. He did not. CT Page 12423
Mr. Baum ignored the conditions of approval and continued to pursue his own plan. He testified that he considered the Commission's proposal "onerous."
On May 1, 1998, the Commission wrote Mr. Baum (plaintiff's exhibit W) advising him that a hearing would be conducted on May 7, 1998, to consider the revoking of permit no. 97-1 for his failure to comply with numerous Standard and Specific Conditions of that approval. On that same day, the Commission issued a Cease and Desist Order and an Order to Appear at a Show Cause Hearing to Mr. Baum. That document indicated that there had been no new violations since October of 1996, but that no effort had been made to alleviate the violations that were present at that time. The document also included a lengthy Suggested Finding of Facts.
On May 13, 1998, the Commission wrote Mr. Baum that Inland Wetlands' Permit No. 97-1 had been revoked at its meeting on May 7, 1998, and in a second letter (plaintiff's exhibit BB) issued a Cease and Desist Order (with requirements for restoration)
Mr. Baum testified concerning the earlier 1993 and 1994 problems and stated that he had fully restored the property in accordance with the Town's restoration plan. As far as the pathway he constructed through the Carlisle muck to the north of the pond in his back yard, he claimed it was all accomplished from materials found on the property. He claims he regarded the Town's requirement that he construct a wooden ramp over the entire length of the Carlisle muck to be onerous. He further claims that he spoke to several outside experts, and on the basis of those discussions, he did not believe that his path through the wetlands would adversely impact the wetland. He presented no testimony from any expert and their reports were excluded by the Court on hearsay grounds. He described the path, how he built it, that he had no permit to do so, that the same plants that are growing in the wet areas to the right and left of the path also grow in the path, that water does flow under the path from side to side and that the water table on both sides of the path are the same.
At the request of the parties, the Court made a physical inspection of the property. The site looking down 75 feet from the back of the defendant's home is simply breathtaking. The site visit did give the Court the opportunity to see the objects on the land and the size and character of the path through the wetland. The property looks lush, especially at this time of the year, and there did not appear to be any obvious contamination or discoloration of water. The path is reasonably solid and is clearly above the level of the water and swamp on either CT Page 12424 side of it. The existence of any adverse impacts upon the wetlands was not obvious or noted, but obviously that may occur below the surface.
The plaintiff has introduced numerous exhibits detailing the ongoing problems between it and the defendants from 1993 to 1998, culminating in a Cease and Desist Order dated May 13, 1998, which was made Exhibit A to the Complaint dated August 18, 1998. That same Cease and Desist Order was offered as Plaintiff's Exhibit BB during the trial. The sole claim in the Complaint is for the enforcement of that Cease and Desist Order by injunction as well as the assessment of a civil penalty under Connecticut General Statute § 22a-44 (b) and reasonable attorney's fees.
In its claim for injunctive relief, the plaintiff is therefore limited by what is contained in exhibit BB, which the court attaches to this memorandum as Exhibit A. That order, addressed to Mr. Baum on behalf of both defendants, is broken down into "Findings of Fact" paragraphs a through h and an Order on pages 2 and 3 in paragraphs 1 through 6. The order for injunctive relief is limited to paragraphs 1 through 6 on pages two and three.
Based on the evidence presented before it, the court finds particularly Mr. Baum's acts in constructing the nature path along the northerly border of the wetland to be a violation of the plaintiff's order as well as other acts specified in the Finding of Facts. The court finds that Mr. Baum knew he did not have a permit to build the path but did so anyway and knew it was in a wetland area. The court does not find that violation to be malicious because it concludes that he honestly believed that the path created by him with logs, chips and mulch, all from the premises, would not compromise the wetland, and he believed the plaintiff's demand that he construct a helical pier structure above the level of the swamp was onerous and unnecessary.
In their initial brief, the plaintiff asked for injunctive relief in 12 specific paragraphs, a civil penalty in the amount of 1.498 million dollars, and counsel fees now exceeding $31,000. The court then contacted counsel by letter dated July 1, 2002, advising them that it had generally found the issues for the plaintiff, but was very concerned about the remedy. The court conducted a short hearing in August to discuss that issue and set the date for another hearing on September 11, 2002, at which time either party could produce expert testimony concerning the feasibility of the injunctive relief sought. The court reopened the case and heard additional witnesses for each side. The parties then filed additional briefs on the subject of remedy.
Almost all of the earlier discussions about remedy concerned the CT Page 12425 plaintiff's request for the removal of the path created by the defendant Baum over the northerly border of the swamp. That path, 10 feet wide and several hundred feet long, was completed by Baum some time before October of 1996. He apparently built it by hand by dumping logs and mulch from his property into the swamp along a path previously used by deer. He essentially filled the areas between hummocks that previously existed in the swamp. The material he used was more permeable than the Carlisle muck making up the swamp and basically was suspended in the swamp. Although the path was at different depths along its length, it remained floating and did not reach the bottom of the swamp. The court walked the path and its spongy nature was obvious. The path would not support heavy equipment. Along the path the defendant Baum has built a large number of bee hives from which he harvests honey.
Originally, the plaintiff sought the removal of all the materials deposited by Mr. Baum for the path. Now, based on their expert's testimony, they only want it removed to the depth of the existing levels of the wetland on either side of the path.
Let us look at the evidence presented at the hearing on September 11, 2002. The plaintiff called Paul Capotosto, a wetland biologist for the Connecticut Department of Environmental Protection, who testified that it was feasible or possible to remove the path and the State had available the low ground pressure equipment to do the work in the swamp. He would give no opinion as to whether the path's removal from the swamp was reasonable or whether it might cause greater harm to the swamp than leaving it there.
The plaintiff next called Robert Jontos, a professional wetlands scientist from Landtec Consultants. of importance to the court is that Mr. Jontos never viewed the Baum property himself. He relied on the field notes of a Mr. Allen from his company who did view the property, conversation with Allen, his inspection of the file, and his review of the file. That may account for the numerous times the witness used the word "may" when describing his opinion of the impact of the path on the environment. He actually never saw it as it existed five to six years after its construction.
Mr. Jontos prepared a restoration plan presumably to correct left over problems from the 1993 clear cutting as well as the later violations. The problem with that is that plan had nothing to do with the cease and desist order of May 13, 1998, and this court does not believe it can impose a 2002 restoration plan to implement a 1998 order. This court cannot order anything more than what was ordered in 1998. CT Page 12426
Mr. Jontos did opine that the path in question alters the ecology of the area, may impede the flow of water underneath it, may introduce predators to the area, and may introduce invasive species to the swamp, although none are existing at this time. He agreed that the material deposited by Baum to make the path is more permeable than the muck itself. He also opined that if there were no additions to the path it would decompose over time. His opinions were supported by other concerns, such as wind throw and canopy loss, that he described. His opinion was that the path should be removed. He would only recommend removing it to the level of the existing elevations of the wetland on either side of the path and not the total removal as has been proposed by the plaintiff.
The defendants produced two experts, George Logan a principal with Rema Ecological Services, LLC and James Norris a consulting landscape designer with Maple Leaf Land Designs and who also works for the Department of the Interior in the Water Resource Division of the United States Geological Survey.
Mr. Logan, who spent three and a half hours on the Baum property, described the Carlisle muck as a floating swamp at least twelve feet deep with numerous hummocks floating on the muck. He disagreed with virtually all of the findings of Mr. Jontos. He described the path as consisting of 65 percent of the existing hummocks which were to the extent of the remaining 35 percent joined by the deposit of materials by Mr. Baum to connect the hummocks. He believes that based on the fact that the path has been there for five to six years and little, if any, adverse impact has been noted on the ground that there is little or no chance that the concerns of Mr. Jontos will ever come to pass.
Mr. Logan's opinion was that the removal of the path at this time was not reasonable and its removal would cause a substantial negative effect on the swamp. He gave several reasons for this which the court will not reiterate.
Mr. Norris has been on the premises in question six times in the last year. He has two Bachelor of Science degrees, one in landscape architecture specializing in landscape presentation and restoration and the other in geology and geophysics with a minor in hydrogeology. He was not paid by the defendants for his opinion or testimony.
Mr. Norris testified that the path has no impact on the flowage of water through or around the Carlisle muck, that runnels connecting the pond to the swamp would be ill-advised and hydrologically speaking the path causes no adverse impact on the swamp. He further opined that the CT Page 12427 flow of water in the swamp is not impeded by the path, that removing the path would actually harm the environment by ripping up root structures and would cause far more damage to the environment than letting it remain. He further testified that the canopy over the path was still full and intact and the wetland was still performing the function of a biofilter as it ordinarily does.
The parties' positions on violations and remedies could not be farther apart. The defendants' simply state they have done nothing wrong and, therefore, should be ordered to do nothing. The plaintiff, on the other hand, wants an injunction ordering twelve separate orders, civil penalties exceeding one and a half million dollars and counsel fees exceeding $31,000. Both positions are equally ridiculous. The original cease and desist order was only in six paragraphs. That is the only order that the defendants are accused of violating. How those six paragraphs could grow to twelve is simply mystifying. Somehow plaintiff's counsel does not distinguish between a finding of fact and an order.
That situation gets worse in the plaintiff's Memorandum Regarding Remedies dated September 19, 2002. It begins with a listing of the twelve steps of injunctive relief originally sought in its original brief on June 14, 2002. Opposite each claimed remedy in a column to the right designated as "Derivation", it sets forth its authority. At least nine of the twelve paragraphs requesting injunctive relief are "derived" from a Cease and Desist order dated May 1, 1998, seven days before the hearing on the May 13 order which was held on May 7, 1998. Only five of the plaintiff's requests are claimed to be derived from the May 13, 1998, order. Another three of the requests list their derivation as "See argument below." The court will ignore any reference to a May 1, 1998, Cease and Desist Order. Plaintiff had ample opportunity to request an amendment to its pleadings to include the order of May 1, 1998, and it did not do so.
The court will now deal separately with the Order of May 13, 1998. Paragraph 1 reads as follows:
 "1. Cease and Desist from any further deposition of material of any kind into the wetland, clear-cutting, or other alteration of the wetland or regulated area, or construction within the regulated area."
That is ordered.
Paragraph 2 reads as follows: CT Page 12428
"2. Within sixty (60) days of the Agency's decision, (i.e., July 6, 1998), restore the wetlands and comply with the letter and intent of the May 13, 1994 Order to Restore Wetlands by removing all of the cut logs visible on the surface of the wetland which were specifically required to be removed under the Finding contained therein. While most of these logs are located on the north side of the pond, this also includes the logs placed around the perimeter of the `garden' area as shown on the survey, and the Belgian blocks."
That paragraph is also ordered but the time for compliance shall be 120 days from the date of this decision. It is unclear to the court whether that paragraph includes the path built by Mr. Baum which has been the main focus of this case. To the extent it does, this order shall not include the path which shall be addressed separately.
Paragraph 3 reads as follows:
"3. By August 1, 1998, submit a revised as-built survey prepared by a licensed land surveyor which clearly depicts the extent of edge of the wooded swamp left remaining from the 1994 clear-cutting; the extent and elevations of all areas in which the limits of wetland soils which have been chipped in this violation. This survey must establish and indicate a permanent (assumed) benchmark in close proximity to the wetland and show many spot elevations over the entire wetland (which is no longer woodland) to the tenth of a foot to `T-2' survey standards."
That paragraph is ordered but the defendants will be given 120 days from the date of this decision to comply.
Paragraph 4 reads as follows:
"4. After restoring the wetland and submitting the required information as per items 2 and 3 above, which fully documents the existing conditions, you must obtain any and all necessary building permits for the shed, greenhouse, and dock. Provided that all provisions of the Order are complied with CT Page 12429 within the stated time period, the dock, and small greenhouse may remain, and staff may endorse a building permit for the completion of the two-story shed. No other greenhouses or structures may be located within the wetland or regulated area in the future without a wetland permit."
That paragraph is ordered.
Paragraph 5 reads as follows:
 "5. Mr. Baum may attempt to experiment with the growing of plants adapted to life in the very strongly acidic and saturated wetland soils within the previously disturbed wetland area only, with no wood chips, logs, or soil added to the wetland. This area is to be strictly limited to the area to be shown on the `as built' survey to be submitted in accordance with this Order."
That paragraph is not ordered as it applies to things that may happen in the future and its meaning is sufficiently equivocal to make enforcement impossible.
Paragraph 6 reads as follows:
 "6. The administrative costs from the 1994 violation, which total $1,590.35, must be paid prior to the release of the $2,400 bond held by the Agency. The bond may be released after all of the logs are removed from the wetland, and the revised `as-built' conditions survey is received and accepted by the Agency."
That paragraph is ordered.
Each of the ordered paragraphs of injunctive relief are binding on each of the defendants.
Both parties seem to agree that the path along the northerly border of the swamp is a part of this order. It is not important where it derives from. The question is should the court order its removal. That request for removal changed radically from the conclusion of the trial to the conclusion of the September 11, 2002, hearing. Originally, the plaintiff sought the removal of all of the materials making up the path. Now they CT Page 12430 are only seeking its removal to the depth of the existing elevation of the wetland on both sides of the path. That concession alone dramatically changed the request for relief and addressed the concerns the court had when it addressed the prospect of ordering the removal of the path.
The plaintiff has established that it is feasible to remove it to the new benchmark, but the court concludes it is not feasible to remove it completely.
The court has carefully reviewed all the testimony of the experts and concludes that the path's removal at this time would adversely impact the environment and the existing wetland more than its retention. There was testimony that the path is sinking now and is decomposing where it may interface with the surface.
What the court does order is that the defendants add no new materials to the path in the future without the approval of the appropriate board or commission of the Town of Fairfield. That includes the entire length and width of the path as it now exists. The sinking or decomposition of the path anywhere along its length or width shall not provide any relief from this order unless it is approved by the plaintiff. The plaintiff may enter the premises at any time to insure compliance with this order.
As to the question of civil penalties, the court does conclude that some penalty should be imposed. The defendants should not be rewarded for violating the rules. The evidence is clear that Mr. Baum knew that he did not have permission to build the path where he did. Even if he believed that its presence would not adversely impact the environment, he had no permission. Although he claims he had experts to support him, there is no evidence that he presented them to the plaintiff. He also violated other orders of the plaintiff. The court will order a civil penalty of $10.00 per day for 232 days in 1998, 365 days in 1999, 366 days in 2000, 365 days in 2001, and 243 days in 2002 ending September 30, 2002, for a total penalty of $15,710.
On the question of attorney's fees, that is a matter within the sound discretion of the court. This court believes that early intervention to settle this case could have been successful. Possibly the long history between the parties had frustrated any prospects for settlement. Each side has expended large sums of time and money to support their own positions as to violations and remedies, many of which have been unreasonable, and the court will leave the parties to bear their own expenses. The request for attorney's fees is denied.
The court will retain jurisdiction to enforce its orders. Judgment CT Page 12431 shall enter in accordance with this memorandum.
GORMLEY, J. CT Page 12432